## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LINCOLNSHIRE POLICE PENSION FUND
One Olde Half Day Road
Village Hall
Lincolnshire, IL 60069
Derivatively on Behalf of EMERGENT
BIOSOLUTIONS INC.,

                  Plaintiff,

    v.

ROBERT G. KRAMER SR.
6872 Oleander Ln
Portage, MI 49024,

FUAD EL-HIBRI
13675 Vanderbilt Dr
Unit 710
Naples, FL 34110,

RICHARD S. LINDAHL
108 E Lenox St
Chevy Chase, MD 20815,

RONALD B. RICHARD
2044 Random Rd
Unit 305
Cleveland, OH 44106,

ZSOLT HARSANYI
10928 Haven Park Cir
Monrovia, MD 21770,

LOUIS W. SULLIVAN
5287 N Powers Ferry NW
Atlanta, GA 30327,

GEORGE A. JOULWAN
2107 S Arlington Ridge Rd
Arlington, VA 22202,

[Caption continued on next page]

Case No.:

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY AND UNJUST
ENRICHMENT


DEMAND FOR JURY TRIAL

#5179809v.1

JEROME M. HAUER
7850 Southdown Rd
Alexandria, VA 22308,

KATHRYN C. ZOON
9709 Culver St
Kensington, MD 20895,

MARVIN WHITE
3821 Paces Lookout Cir SE
Unit 20
Atlanta, GA 30339,

SYED T. HUSAIN
21 Dahlia Ct
Piscataway, NJ 08854,

SUE BAILEY
8665 Bay Colony Dr
Apt 801
Naples, FL 34108,

     Defendants,


   -and-

EMERGENT BIOSOLUTIONS INC.,
400 Professional Drive, Suite 400,
Gaithersburg, MD 20879,
a Delaware corporation,

     Nominal Defendant.

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange

#5179809v.1

Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Emergent BioSolutions Inc. ("Emergent" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Emergent's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed Emergent to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Emergent is a life sciences company that focuses on products and solutions for public health threats.  The Company's main business was producing the vaccine for anthrax for the U.S. government's national stockpile.  In 2020, the Company's focus shifted with the outbreak of the COVID-19 pandemic.  Two different drug companies, Johnson & Johnson ("J&J"), and AstraZeneca, contracted with Emergent to make their COVID-19 vaccines at Emergent's facility located in Baltimore, Maryland (the "Bayview Facility").  Emergent touted these deals to the public, sending its stock price skyrocketing.

3.      Unfortunately, and hidden from the public, the Bayview Facility had a history of internal control failures and was not prepared to handle the massive and critical work required to manufacture J&J and AstraZeneca's vaccines.  An April 2020 inspection by the U.S. Food and Drug Administration found that the Bayview Facility's employees lacked the required training, had poor quality controls, and was "not ready for commercial operations."

4.      Rather than fix these problems, the Individual Defendants (defined *supra*) pushed forward with manufacturing these vaccines with Emergent's poorly trained and overworked employees.  Disaster, predictably, ensued.

5.      On March 31, 2021, news reports revealed that Emergent mixed-up the ingredients for the J&J and AstraZeneca vaccines, contaminating up to fifteen million doses of J&J's critically needed vaccine.  Moreover, the reports stated that the mix-up occurred in February 2021, over a month before the reports came out, and Emergent never told the public.  Further, it was not Emergent's deficient quality controls that found the problem, but J&J.

6.      The public reaction was swift.  Emergent's stock plunged more than 13%, erasing over $667 million in marketing capitalization.  The Biden administration forced Emergent to hand over the controls of the Bayview Facility to J&J and prevent Emergent from manufacturing the AstraZeneca vaccine there.

7.      News organizations turned their attention on Emergent, as top newspapers published damaging article about the Company history of internal control deficiencies at the Company.  For example, in November 2020 an Emergent employee hooked up a wrong gas line and "suffocated" the cells needed for J&J's vaccine.

8.      Investors sued and Emergent is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the District of Maryland on behalf of investors who purchased Emergent's shares.

9.      While Emergent and the Company's outside investors were hammered by the Company's deficient internal controls, the same is not true for the Individual Defendants.  In addition to the millions in compensation those individuals have received, certain of the defendants

sold over $20 million of their personally held Emergent stock on the basis of the nonpublic information about the problems at the Bayview Facility, detailed further herein.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Emergent maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Emergent, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Lincolnshire Police Pension Fund was a stockholder of Emergent at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Emergent stockholder. Plaintiff is a citizen of Illinois and Wisconsin.

#5179809v.1

**Nominal Defendant**

14.     Nominal defendant Emergent is a Delaware corporation with principal executive offices located at 400 Professional Drive, Suite 400, Gaithersburg, Maryland.   Accordingly, Emergent is a citizen of Delaware and Maryland.   Emergent is global life sciences company focused on providing innovative preparedness and response solutions addressing accidental, deliberate and naturally occurring public health threats.  As of December 31, 2020, the Company had approximately 2,200 employees.

**Defendants**

15.     Defendant Robert G. Kramer Sr. ("Kramer") is Emergent's Chief Executive Officer and a director and has been since April 2019 and President and has been since March 2018. Defendant Kramer was the Company's Chief Operating Officer from March 2018 to March 2019; Executive Vice President, Administration, Chief Financial Officer and Treasurer from September 2012 to March 2018; and Chief Financial Officer in 1999.   Defendant Kramer held various executive positions from 1999 to 2010.  Defendant Kramer is a member of Emergent's Strategic Operations Committee and has been since at least April 2019.  Defendant Kramer is named as a defendant in two related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.   While in possession of material, nonpublic information concerning Emergent's true business health, defendant Kramer sold 88,555 shares of his stock for $10.1 million in proceeds.   Emergent paid defendant Kramer the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2020 | $893,860 | $2,050,007 | $1,392,416 | $1,225,020 | $8,675 |

#5179809v.1

Defendant Kramer is a citizen of Michigan.

16.     Defendant Fuad El-Hibri ("El-Hibri") is Emergent's Executive Chairman and has been since April 2012.  Defendant El-Hibri was the Company's Chief Executive Officer and Chairman from June 2004 to March 2012 and President from March 2006 to April 2007. Defendant El-Hibri is Chair and a member of Emergent's Strategic Operations Committee and has been since at least April 2019.  Emergent paid defendant El-Hibri the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation |
|------|--------|--------------|---------------|------------------------|
| 2020 | $1,192,202 | $1,200,046 | $815,051 | $6,185 |

Defendant El-Hibri is a citizen of Florida.

17.     Defendant Richard S. Lindahl ("Lindahl") is Emergent's Executive Vice-President, Chief Financial Officer and Treasurer and has been since March 2018.  Defendant Lindahl is named as a defendant in two related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. Emergent paid defendant Lindahl the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|--------------|---------------|----------------------------------------|------------------------|
| 2020 | $549,390 | $749,998 | $509,425 | $462,012 | $10,475 |

Defendant Lindahl is a citizen of Maryland.

18.     Defendant Ronald B. Richard ("Richard") is Emergent's Lead Independent Director and has been since at least May 2013 and a director and has been since January 2005.  Defendant Richard is a member of Emergent's Audit Committee and Strategic Operations Committee and has been since at least April 2019.  While in possession of material, nonpublic information concerning

Emergent's true business health, defendant Richard sold 29,119 shares of his stock for $2.685 million in proceeds.  Emergent paid defendant Richard the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $140,000 | $250,000 | $390,000 |

Defendant Richard is a citizen of Ohio.

19.     Defendant Zsolt Harsanyi ("Harsanyi") is an Emergent director and has been since August 2004.  Defendant Harsanyi is the Chair of Emergent's Audit Committee, a member of Emergent's Scientific Review Committee, and a member of Emergent's Strategic Operations Committee and has been since at least April 2019.  While in possession of material, nonpublic information concerning Emergent's true business health, defendant Harsanyi sold 11,549 shares of his stock for $1.288 million in proceeds.  Emergent paid defendant Harsanyi the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $110,000 | $250,000 | $360,000 |

Defendant Harsanyi is a citizen of Maryland.

20.     Defendant Louis W. Sullivan ("Sullivan") is an Emergent director and has been since June 2006.  Defendant Sullivan is a member of Emergent's Audit Committee and has been since at least April 2019.  While in possession of material, nonpublic information concerning Emergent's true business health, defendant Sullivan sold 28,418 shares of his stock for $3.16 million in proceeds.  Emergent paid defendant Sullivan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $105,000 | $250,000 | $355,000 |

Defendant Sullivan is a citizen of Georiga.

21.     Defendant George A. Joulwan ("Joulwan") is an Emergent director and has been since July 2013.  Defendant Joulwan is a member of Emergent's Audit Committee and has been since April 2019.  While in possession of material, nonpublic information concerning Emergent's true business health, defendant Joulwan sold 8,000 shares of his stock for $915,006 in proceeds. Emergent paid defendant Joulwan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $95,000 | $250,000 | $345,000 |

Defendant Joulwan is a citizen of Virginia.

22.     Defendant Jerome M. Hauer ("Hauer") is an Emergent director and has been since January 2015 and from May 2004 to October 2011.  Defendant Hauer is Chair and a member of Emergent's Scientific Review Committee and a member of Emergent's Strategic Operations Committee and has been since at least April 2019.  Emergent paid defendant Hauer the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $105,000 | $250,000 | $355,000 |

Defendant Hauer is a citizen of Virginia.

23.     Defendant Kathryn C. Zoon ("Zoon") is an Emergent director and has been since October 2016.  Defendant Zoon is a member of Emergent's Scientific Review Committee and a member of Emergent's Strategic Operations Committee and has been since at least April 2019. While in possession of material, nonpublic information concerning Emergent's true business health, defendant Zoon sold 6,753 shares of her stock for $620,046 in proceeds.  Emergent paid defendant Zoon the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $95,000 | $250,000 | $345,000 |

#5179809v.1

Defendant Zoon is a citizen of Maryland.

24.     Defendant Marvin White ("White") is an Emergent director and has been since October 2020 and from June 2010 to May 2016.  Defendant White is a member of Emergent's Scientific Review Committee, and a member of Emergent's Strategic Operations Committee and has been since at least April 2019.  Emergent paid defendant White the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $21,250 | $375,000 | $396,250 |

Defendant White is a citizen of Georgia.

25.     Defendant Syed T. Husain ("Husain") was Emergent's Senior Vice President and Head of Contract Development and Manufacturing (CDMO) Business Unit from at least November 2019 to at least April 2021.  Defendant Husain is named as a defendant in two related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder.  Defendant Husain is a citizen of New Jersey.

26.     Defendant Sue Bailey ("Bailey") was an Emergent director from June 2007 to May 2021.  While in possession of material, nonpublic information concerning Emergent's true business health, defendant Bailey sold 18,155 shares of her stock for $1.8 million in proceeds.  Emergent paid defendant Bailey the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2020 | $90,000 | $250,000 | $340,000 |

Defendant Bailey is a citizen of Florida.

27.     The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15-16, 18-24 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶18-21 are referred to herein as the "Audit Committee

- 9 -

Defendants." The defendants identified in ¶¶19, 22-24, 26 are referred to herein as the "Scientific Review Committee Defendants." The defendants identified in ¶¶15-16, 18-19, 22-24 are referred to herein as the "Strategic Operations Committee Defendants." The defendants identified in ¶¶15, 18-21, 23, 26 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶15-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Emergent and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Emergent in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Emergent and not in furtherance of their personal interest or benefit.

29.     To discharge their duties, the officers and directors of Emergent were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Emergent were required to, among other things:

(a)     operate the Company's facilities in accordance with all rules and regulations;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

#5179809v.1

(c)    not trade their personally held stock on the basis of their knowledge of nonpublic information; and

(d)    remain informed as to how Emergent conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

30.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Emergent, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

31.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in the improper practices that caused Emergent to incur substantial damage.

32.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Emergent, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Emergent has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Strategic Operations Committee**

33.      In addition to these duties, the Strategic Operations Committee Defendants, defendants El-Hibri, Harsanyi, Hauer, Kramer, Richard, White, and Zoon, owed specific duties to Emergent to assist the Board of Directors (the "Board") in "assessing matters of strategic interest for the growth and development of the Company's business."

34.      The particular areas of oversight for the Strategic Operations Committee include:

Strategic Operations Committee Areas of Oversight

1. Strategic Planning. The Strategic Operations Committee shall review, evaluate and, when appropriate, make recommendations to the Board with respect to the Company's mission and core strategy, the Company strategic plan objectives and success criteria and the Company strategic processes.

*     *     *

3. Material Litigation and Disputes. The Strategic Operations Committee shall review, evaluate and, when appropriate, make recommendations to the Board with respect to the Company's position on material litigation and disputes, including potential settlement and disposition of such litigation and disputes.

4. Financial Planning. The Strategic Operations Committee shall review, evaluate and, when appropriate, make recommendations to the Board with respect to capital structures, the 5-year plan, security issuances and the stock buyback and dividend policy.

5. Corporate Reputation. The Strategic Operations Committee shall review, evaluate and provide advice to management with respect to the Company's strategy and activities on corporate reputation.

**Additional Duties of the Audit Committee Defendants**

35.      In addition to these duties, the Audit Committee Defendants, defendants Harsanyi, Joulwan, Richard, and Sullivan, owed specific duties to Emergent to assist the Board in its oversight of:

- the quality and integrity of the Company's financial statements;

- the Company's financial guidance;

- the Company's accounting and financial reporting processes;

- the Company's internal control over financial reporting;

- the Company's compliance with legal and regulatory requirements and internal policies and procedures;

36. In addition, the Audit Committee's Charter provides the following:

**Audited Financial Statements**

12. Review and Discussion. The Audit Committee shall meet to review and discuss with the Company's management and principal auditor the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters required to be discussed by AS 1301.

13. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

\*   \*   \*

**Review of Other Financial Disclosures**

15. Principal Auditor Review of Interim Financial Statements. The Audit Committee shall direct the principal auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the principal auditor's review of interim financial information.

16. Earnings Release and Other Financial Information. The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

17. Quarterly Financial Statements. The Audit Committee shall meet to review and discuss with the Company's management and principal auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Oversight of Ethics & Compliance and Risk Management**

26. Oversight. The Audit Committee shall coordinate the Board's oversight of the performance of the Company's Ethics & Compliance and Risk Management functions.

27. Ethics & Compliance Plan and Budget Approval. The Audit Committee shall review the annual Ethics & Compliance plan, objectives, schedules, and any special projects undertaken by the Ethics & Compliance function. The Audit Committee shall review the budget necessary to support the approved activities.

28. Plan Implementation. The Audit Committee shall discuss with the Ethics & Compliance Office the implementation of, and any changes to, the Ethics & Compliance plan and any special projects.

29. Reporting frequency. A representative from the Ethics & Compliance Office shall periodically report the status of the plan with the Audit Committee and, as requested, a representative of the Office shall attend Audit Committee meetings. Reports may be made at more frequent intervals if deemed necessary by the Audit Committee or as requested by the Ethics & Compliance Office.

30. Management Interaction. The Audit Committee shall discuss with the Ethics & Compliance Office any problems or difficulties in implementing the plan, including any restrictions on the scope of the Ethics & Compliance Office's activities or on access to requested information, and management's response to same and any other matters required to be brought to its attention.

31. Access rights. The Audit Committee shall direct Company management, as necessary, to provide the members of the Ethics & Compliance Office unrestricted access to all of the Company's records, reports, personnel, and physical properties as determined by the members of the Ethics & Compliance Office to be relevant to the performance of their duties.

32. Risk Management. The Audit Committee shall discuss with the Risk Management Office the Company's procedures with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. The Audit Committee shall periodically review and comment on risk assessments performed by management.

**Additional Duties of the Scientific Review Committee Defendants**

37.     In addition to these duties, the Scientific Review Committee Defendants,

defendants Bailey, Harsanyi, Hauer, White, and Zoon, owed specific duties to Emergent to assist

- 14 -

the Board in its evaluation of "the Company's investment in research and development ("R&D") and related technologies."

> Scientific Committee Review Matters

> 1. Scientific and Product Review. The Scientific Review Committee shall provide scientific advice and guidance to the Board regarding its governance and decisions related to existing products and technology platforms.

*   *   *

> 3. Transaction Review. The Scientific Review Committee shall provide scientific advice and guidance to the Board with respect to its governance and decisions related to material proposed acquisitions, in-licensing, collaborations and alliances with key scientific organization.

## DEFENDANTS ALLOW THE BAYVIEW FACILITY TO OPERATE WITHOUT QUALITY CONTROLS

### Appropriate Quality Controls Are Vital to the Company

38.    As a developer and manufacturer of drugs, the Company must abide by various stringent laws and regulations.  As the Company's most recent Annual Report on Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC") on February 19, 2021 explained,

> Facilities involved in the manufacture and distribution of approved products are required to be registered with the [U.S. Food and Drug Administration ("FDA")] and certain state agencies and are subject to periodic unannounced inspections by the FDA for compliance with [current good manufacturing policies ("cGMP")] and other laws.

39.    Concerning vaccines, the Form 10-K notes that Emergent has "invested significant effort and financial resources in the development of our vaccines, therapeutics and medical device product candidates and the acquisition of additional product candidates[,]" but the ability to be successful commercially depends on the "successful development, formulation and cGMP scale-up of manufacturing that meets FDA or other foreign regulatory requirements."

40.     The Form 10-K further notes that:

Any product candidate for which we or our collaborators obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such product, will be subject to continual requirements of and review by the FDA and other regulatory authorities. These requirements include submissions of safety and other post-marketing information and reports, registration and listing requirements, cGMP requirements relating to quality control and manufacturing, quality assurance and corresponding maintenance of records and documents, and requirements regarding the distribution of samples to physicians and recordkeeping.

*     *     *

[A]ny vaccine, therapeutic product or medical device for which we obtain marketing approval, along with the manufacturing processes, post-approval clinical data, labeling, advertising and promotional activities for such product, will be subject to continual requirements of and review by the FDA and other regulatory bodies. Our approved products are subject to these requirements and ongoing review. These requirements include submissions of safety and other post-marketing information and reports, plasma donor testing, registration requirements, cGMP, requirements relating to potency and stability, quality control, quality assurance, restrictions on advertising and promotion, import and export restrictions and recordkeeping requirements…. Government regulators enforce cGMP and other requirements through periodic unannounced inspections of manufacturing facilities.

41.     Accordingly, it was mission critical to the Company that the Individual Defendants develop and enforce cGMP.  The FDA explains that cGMP are systems to assure proper design, monitoring, and control over manufacturing processes and facilities in FDA-regulated industries. These systems are designed to help organizations assure drug products are the correct identity, strength, purity, and quality.  cGMP systems include a series of controls for quality focused operations, including: (i) Management Systems; (ii) Quality Raw Materials; (iii) Operating Procedures; (iv) Detecting Deviations; (v) Investigating Deviations; and (vi) Reliable Testing.  As explained herein, the Individual Defendants failed, repeatedly, to have the Company's Bayview Facility operated in accordance with cGMP.

- 16 -

**The Individual Defendants Fail to Implement Appropriate Controls Despite Vital Vaccine Production Occurring and the Bayview Facility**

42.     The Company has a long history of not meeting drug production requirements for preparedness, safety, and cleanliness, among other internal deficiencies.  The Company's traditional main source of revenue was selling the anthrax vaccine to the U.S. government.  Emergent is the Country's sole provider of the anthrax vaccine to the Strategic National Stockpile (the "SNS").  In 1998, Emergent, then known as BioPort Corporation, bought a state-run laboratory in Lansing, Michigan and took over the lab's contract to supply anthrax vaccines to the government.  Since that time, Emergent increased the price of the anthrax vaccine by 800%.  As a result, nearly half of the SNS's budget was spent purchasing the anthrax vaccine.

43.     In 2012, the government awarded Emergent a $163 million contract to prepare the Bayview Facility for mass production of a vaccine in the event of a pandemic.  The government contract required Emergent to show that it could produce up to 50 million doses of a flu vaccine within four months of a pandemic in order to demonstrate its rapid-response capabilities.  The Company, however, still could not meet that requirement eight years later.  In fact, in June 2019, a government review stated that "Emergent does not have a candidate, strategy, or plan for fulfilling the flue requirement…. Emergent needs to make this a priority so they are not in default."

44.     The inability to meet pandemic readiness requirements, despite receiving nearly $170 million to do just that, was not Emergent's only failure in 2019.  In December 2019, Emergent failed to properly test a client's vaccine before releasing it.  The customer was forced to suspend its drug trial and is now seeking $19 million from the Company.  In a follow up audit in February 2020, the client stated that "the primary driver" of the mistake was that defendant instituted "a culture where written instructions are regularly not followed with no consequences."

45.     The controls failures continued into 2020.  The FDA inspected the Bayview Facility in April 2020.  It stated that the Company did not have the necessary personnel to produce a coronavirus vaccine, had inadequate training, and failed to follow testing procedures.  The FDA provided a list of observations of the deficient controls, including that "[e]stablished specifications, test procedures and laboratory control mechanisms are not followed and documents at the time of performance"; that "[t]he responsibilities and procedures applicable to the quality control unit are not in writing and fully followed"; "[s]eparate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to holding of rejected components before disposition"; and "employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices."  In short, the Bayview Facility was "not ready for commercial operations."

46.     Two months later, in June, the FDA stated that Emergent's plan for producing the coronavirus vaccines was inadequate due to poorly trained staff and quality control problems.  Nevertheless, in June 2020, the U.S. Government awarded Emergent a $628 million contract to prepare its factories to make coronavirus vaccines as part of Operation Warp Speed.

47.     J&J, AstraZeneca, and NovaVax all selected Emergent to make their COVID-19 vaccines, though NovaVax later went to a different facility than Bayview.  The deals with J&J and AstraZeneca were each worth roughly $875 million.

48.     A few days after receiving the government contract, Carlo de Notaristefani, a manufacturing expert who oversaw production of the COVID-19 vaccines for the federal government, visited the Bayview Facility.  de Notaristefani's report on the Bayview Facility cited "key risks" that "will require significant effort" to address and that the Company "will have to be monitored closely."   de Notaristefani also wrote that to make large amounts of COVID-19

vaccines, the Company "will have to strengthen" its quality controls, requiring "significant resources and commitment."

49.     In July 2020, the Company conducted its own internal audit.  Emergent found that the flow of workers and materials through the plant was not adequately controlled "to prevent mix-ups or contamination."   Further, the Company's internal auditors noted that errors "are not investigated to determine root cause or are not investigated adequately."   In addition, "investigations are terminated without sufficient cause."

50.     In August 2020, another internal investigation by Emergent found that the Company approved four raw materials used to produce AstraZeneca's vaccines without first fully testing them.  The Company continued this failure even after the internal investigation.

51.     Between October 2020 and January 2021, Emergent threw away five lots of the AstraZeneca vaccine because of contamination or suspected contamination.  Each lot is equivalent of two million to three million doses.

52.     In addition, in November 2020, the Company had to discard a batch of J&J's vaccine after workers "hooked up" the wrong gas line an accidently "suffocated" the cells necessary for the vaccines.

53.     Given the Company's nonexistent controls, these types of errors were expected.  A review of the Company's practices found that in December 2020, workers making AstraZeneca's vaccine deviated from manufacturing standards more than three times a day, on average.

54.     In late February 2021, due to the deficient, and known, quality controls at the Bayview Facility, Company employees mixed up the ingredients for the J&J and AstraZeneca vaccines.  This mix-up led to the contamination and ruining of 15 million doses of J&J's vital vaccine.  According to a March 31, 2021, *New York Times* article, Emergent's "mix-up" went

unnoticed for days until J&J's quality control check found the mistake.  The *New York Times* further revealed on April 21, 2021, that Emergent failed to fully investigate the contamination and, as a result, the FDA was concerned that additional vaccines doses manufactured at the plant were contaminated.  The FDA noted that even after the contamination, Emergent only undertook a routine cleaning afterwards.

55.     After the Biden administration learned that the Company mixed up the ingredients for the J&J and AstraZeneca vaccine, it put J&J in charge of the Bayview Facility.  In addition, the Biden administration stopped Emergent's production of the AstraZeneca vaccine in order to avoid similar mix-ups in the future.

56.     On April 6, 2021, the *New York Times* published an article entitled, "U.S. Bet Big on Covid Vaccine Manufacturer Even as Problems Mounted."  The article revealed that audits and investigation in 2020 conducted by J&J, AstraZeneca, two federal agencies, and the Company's own internal evaluators found the Company had not followed basic industry standards at the Bayview Facility, and found repeated shortcomings in efforts to disinfect and prevent contamination.  According to the article, "[t]he audits and investigations also flagged a persistent problem with mold in areas required to be kept clean, poor disinfection of some plant equipment leading to growth of bacteria, the repeated approval of raw materials that had not been fully tested, and inadequate training of some employees."

57.     A report by the *New York Times*, published on April 7, 2021, revealed that the Bayview Facility was chronically understaffed.  The *New York Times* talked with two ex-supervisors of the Company who stated that employees are overwhelmed and some often had to work more than seventy hours a week.  The *New York Times* article also stated that it reviewed the

#5179809v.1

Company's logs and which "showed that employees repeatedly said they deviated from manufacturing standards because of a lack of manpower and shortened production times."

58.     On April 12, 2021, the FDA inspected the Company's Bayview Facility.  What it was seeing was so bad that the FDA asked Emergent to halt manufacturing at the Bayview Facility until its investigation was complete and the Company remediated any issues.

59.     Emergent revealed the production halt on April 19, 2021, but did not provide any of the specifics behind any issues the FDA found.  Instead, the Company stated that it would make improvements "to meet the high standards we have set for ourselves and to restore confidence in our quality systems and manufacturing processes."

60.     According to reports, Emergent's business partners and other governmental regulators also warned the Company about its internal control deficiencies.  J&J's auditors claimed that Emergent filed monitoring reports for bacteria or other contaminants four to six months late. AstraZeneca stated that Emergent would use loose monitoring criteria, such as "historical averages" but still failed audits.  The Biomedical Advanced Research and Development Authority ("BARDA") also found similar concerns, including marking the risk of microbiological contamination as "Critical", the designation reserved for the most serious problems that pose immediately and significant risk.

61.     Then, on April 20, 2021, House Democrats announced that they were investigating Emergent's contract to make the vaccines.  U.S. Representatives Carolyn B. Maloney and James E. Clyburn wrote to defendants Kramer and El-Hibri stating that "we are investigating reports that Emergent received multi-million-dollar contracts to manufacture coronavirus vaccines despite a long, documented history of inadequately trained staff and quality control issues."  The lawmakers were looking into the role Dr. Robert Kadlec, a former consultant to Emergent and President

Trump's assistant secretary for preparedness and response, played in the Company receiving a contract. They wrote: "Emergent received $628 million in June 2020 to establish the primary U.S. facility for manufacturing vaccines developed by Johnson & Johnson and AstraZeneca[.]" Kadlec "appears to have pushed for this award despite indications that Emergent did not have the ability to reliably fulfill the contract." Representatives Maloney and Clyburn's letter also revealed the FDA's criticisms of the Company in April and June 2020.

62.    On April 21, 2021, the FDA released its report on its review of the Bayview Facility. The problems were legion. The FDA stated that the Bayview Facility was: (a) too small; (b) poorly designed; and (c) dirty. The FDA observed unsealed bags of medical waste, peeling paint, and damaged floors and walls that could inhibit proper cleaning. Concerning the staff, the FDA stated that Emergent "has failed to adequately train personnel involved in manufacturing operations, quality control sampling, weigh and dispense, and engineering operations to prevent cross-contamination of bulk drug substances." The FDA reviewed security footage at the Bayview Facility and found that the Company's employees regularly violated rules requiring workers to change gowns and bootees and shower before crossing between the different manufacturing zones for the J&J and AstraZeneca vaccines.

## IMPROPER STATEMENTS

63.    In addition to operating the critical Bayview Facility in a deficient manner, the Individual Defendants also made a series of false statements, further damaging the Company's reputation and credibility and exposing it to significant liability. In particular, on April 23, 2020, Emergent announced that it signed an agreement to be the U.S. manufacturing Partner for J&J's vaccine candidate. The Company stated the agreement was worth approximately $135 million and

that it would do the large scale manufacturing at the Bayview Facility.  The press announcing the

agreement bragged about Bayview's capabilities, stating:

> Emergent's Bayview facility has unique capabilities across four independent suites
> to produce at clinical scale to get candidates rapidly into the clinic, while at the
> same time scaling up to enable large-scale manufacturing to up to 4000L to prepare
> for production of commercial volumes to meet customer demand. The CIADM has
> the capacity to produce tens to hundreds of millions of doses of vaccine on an
> annual basis, based upon the platform technology being used.

64.     On April 30, 2020, the Company held an earnings call to discuss its results for the

first quarter of the 2020 fiscal year.  During the call, defendant Kramer discussed Emergent

working with J&J, Novavax, and Vaxart to manufacturing their developmental COVID-19

vaccinations.  In particular, he stated:

> First, we're taking our history of working hand-in-hand with the U.S. government
> to be able to develop and manufacture critical vaccines and therapeutics, and
> applying those skills to help our fellow innovators, such as J&J, Novavax, and
> Vaxart, to accelerate the development of their COVID-19 candidates and be in a
> position to manufacture them in significant quantities. Secondly, *we're leveraging*
> *our long history of manufacturing our own therapeutics and vaccines to develop*
> *2 COVID-19 product candidates*, which we'll discuss in more detail later on the
> call.

> Simply put, Emergent is built for this challenge….

> [L]et me conclude with a few summary thoughts. *First, Emergent is uniquely*
> *prepared to answer the call for medical solutions to the COVID pandemic. We*
> *have proven manufacturing capabilities in place and, in concert with the U.S.*
> *government, have built the ability to quickly advance early-stage candidates*
> *through development to commercial-scale manufacturing. We're working with*
> *leading innovators in support of their efforts to develop vaccines, while at the*
> *same time advancing 2 potential therapy of our own.*

> Second, there's no organization better prepared to take on this challenge than the
> 2,000-person-strong Emergent team. Their continued commitment to our patients
> and customers, to each other, and to our mission to protect and enhance lives is
> unwavering.

#5179809v.1

65.     Defendant Husain also discussed Emergent's infrastructure and manufacturing capabilities during the call, claiming that these were strengths the Company was leveraging.  In particular, he stated:

> Emergent's state-of-the-art infrastructure, proven track record, and expertise in development and manufacturing as well as commercialization of solutions that address public health threats, provide the foundation for a differentiated CDMO that allows us the ability to work with 5 technology platforms and deploy our network of 9 development and manufacturing sites. We leverage these strengths to pave the way for fellow innovators to progress their clinical candidates to benefit patients. We have been, and continue to be, built for this.

66.     On May 12, 2020, Emergent participated in Bank of America Merrill Lynch's 2020 Virtual Healthcare Conference.  During the conference, defendant Lindahl gave a presentation on, among other things, the Company's competitive advantages, which included Emergent's manufacturing capabilities.  In particular, he stated:

> We have a number of competitive advantages on this front as you can see in the middle of the page. We offer these services out of our 9 global development and manufacturing sites. And in particular, we have one of those sites has been designated as a center for innovation and advanced development and manufacturing. That's what we refer to as our Bayview site in Baltimore. And that has been the locus of a number of the contracts that we've announced in recent weeks.

67.     The presentation was accompanied by the following slide, which was also published on Emergent's website.  The presentation slide claimed the Company had an "[i]ndustry-leading track record" and could bring products to market with "[s]peed and flexibility".  The slide also highlighted the Company's "center for innovation and advanced development and manufacturing", which was the Bayview Facility:



68. During the conference, defendant Lindahl also stated that: "that Emergent has always been a unique company with distinctive capabilities, particularly in high-quality manufacturing" and that "this is a set of services to address the whole spectrum of molecule-to-market offerings, leveraging our capabilities that we've developed over time in our state-of-the-art manufacturing facilities."

69. On June 1, 2020, Emergent issued a press release announcing that it "Join[ed] U.S. Government's Warp Speed Program in Landmark Public-Private CDMO Partnership for COVID-19 Vaccine Development and Manufacturing." The press release stated that "Emergent will provide molecule-to-market CDMO services and commit manufacturing capacity, valued at approximately $542.7 million, paving the way for pharmaceutical and biotechnology innovators to advance COVID-19 programs." The press release quoted defendant Kramer as stating: "*Emergent is proud of this expanded BARDA partnership that symbolizes confidence in our development and manufacturing capabilities that have served the U.S. government's needs for more than two decades….* Our longstanding record of delivering safe and effective medical

- 25 -

countermeasures for public health positions us to continue to help at this critical moment by advancing COVID-19 vaccine programs of our fellow innovators in the industry."  In addition, the press release stated:

> Emergent's Baltimore Bayview CIADM facility was established through a public-private partnership with HHS in 2012 and was designed for rapid manufacturing of large quantities of vaccines and treatments during public health emergencies. The Baltimore Bayview facility has the capacity to produce tens to hundreds of millions of doses of vaccine on an annual basis, based upon the platform technology being used. The task order extends the CIADM collaboration to include viral and non-viral drug product fill/finish capabilities at Emergent's Rockville and Baltimore Camden facilities. Activities under this task order are in addition to the company's previously announced collaborations for COVID-19 vaccine candidates with the Janssen Pharmaceutical Companies of Johnson & Johnson, Novavax, and Vaxart that are currently underway.

> "Emergent's landmark partnership with BARDA puts us at the forefront of CDMO collaborations, elevating us to respond to these unprecedented times," said Syed T. Husain, SVP and CDMO business unit head at Emergent. "This innovative solution paves the way for pharmaceutical and biotechnology innovators with leading COVID-19 vaccine candidates to have an established U.S. development and manufacturing supply chain. This investment in increased capacity and capabilities will serve the industry's expanding clinical and commercial pipelines more broadly, ultimately benefiting more patients globally."

70.     On June 24, 2020, Emergent participated in the IDEAS Northeast Investor Conference 2020.  Defendant Lindahl gave a presentation on behalf of the Company at the conference, which was published on the Company's website.  The presentation contained the same misleading slide identified above from the May 12 conference.  It also stated that one of Emergent's core strategies was to "[b]uild [s]calable [c]apabilities."  The presentation also contained a slide concerning the Company's "CDMO COVID-19 partnerships."  In the slide, the Company claimed it had the capacity to manufacture up to 300 million doses at the Bayview Facility (notably Bayview was the only facility working on all four COVID-19 partnerships).  In particular, the slide stated:

#5179809v.1





## CDMO COVID-19 partnerships

**Novavax**
- Agreement provides clinical supply to support Phase 1 trial in May 2020

**Vaxart**
- Agreement provides clinical supply to support Phase 1 trial in H2 2020

**Johnson & Johnson**
- Agreement to be US manufacturer of drug substance, enables readiness and reservation of certain capacity to provide large-scale manufacturing in 2021
- Capacity up to 300M doses annually
- Long term commercial supply agreement under negotiation

**AstraZeneca**
- Agreement to be US supplier of drug substance, enables development services, tech transfer, PPQ, large-scale capacity reservation through 2020
- Supply agreement under negotiation

22   COVID-19 RESPONSE

71.   Regarding the Operation Warp Speed Program, the presentation stated:

## Emergent and US Government Warp Speed Program



- **$628M** Task Order under existing **CIADM** contract for rapid production of **leading COVID-19 vaccine candidates**

- Emergent provides **molecule-to-market CDMO** services and commits manufacturing capacity **[$543M]**

- Expands **viral and non-viral** CDMO drug product fill/finish capacity **[$85M]**

*"Emergent's manufacturing capabilities will pave the way for drug companies with candidates approaching approval to begin turning out doses. Securing more manufacturing capacity here in America for candidates that make it to the final stages of Operation Warp Speed will help get a vaccine to American patients without a day wasted."*

— **Alex Azar, US HHS Secretary**

**EMERGENT**

25   COVID-19 RESPONSE

72.   On July 6, 2020, Emergent issued a press release announcing that it signed a "Five-Year Agreement for Large-Scale Drug Substance Manufacturing for Johnson & Johnson's Lead COVID-19 Vaccine Candidate."  The deal called for Emergent to provide "contract development

and manufacturing (CDMO) services to produce drug substance at large scale over five years, value at approximately $480 million for the first two years."  The press release quoted defendant Kramer as claiming that Emergent had "the expertise and capabilities to meet the long-term needs of [its] customers and provide ongoing commercial manufacturing to benefit patients."

73.    On July 27, 2020, Emergent issued a press release announcing it signed an agreement with AstraZeneca to expand manufacturing for its COVID-19 vaccines.  In the press release, defendant Husain stated, "Emergent stands ready alongside leading innovators to rapidly deploy our CDMO services to help meet the substantial demand for a vaccine – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life."

74.    On July 30, 2020, the Company issued a press release announcing its financial results for its second quarter and six months ended June 30, 2020.  That same day, the Company held an earnings conference call to discuss its results.  During the call, defendant Kramer stated, "Emergent is uniquely prepared to answer the call for [the] COVID-19 pandemic", with the Company's "proven manufacturing capabilities in place."  In particular, he stated:

> In June, in an award valued at approximately $628 million, Emergent joined the U.S. government in a landmark public-private CDMO partnership as part of Operation Warp Speed, committing our development and manufacturing services for production of COVID-19 vaccine candidates for commercial innovators through 2021 at a minimum. This agreement secures capacity for drug substance manufacturing and drug product manufacturing at our 3 Maryland-based facilities. It also includes an incremental investment of $85 million for the rapid expansion of our viral and nonviral CDMO drug product fill/finish capacity at our Baltimore, Camden and Rockville facilities.

> *  *  *

> Also in June, we announced a partnership to manufacture AstraZeneca's leading vaccine candidate. Under that agreement, valued at approximately $87 million, Emergent will provide development services, technology transfer, analytical testing, drug substance process and performance qualification and will reserve certain large-scale manufacturing capacity through 2020. Earlier this week, we

- 28 -

announced an additional agreement with AstraZeneca to manufacture drug substance at large scale for commercial supply. The contract is valued at approximately $174 million through 2021, and it brings the total AstraZeneca commitment to just over $260 million. The agreement leaves open the option to enter into additional commercial manufacturing commitments as the candidate progresses over the next 3 years.

Given the scale and the ongoing nature of the threat as well as our diverse offering across development services, drug substance, drug product and our leading development and manufacturing expertise, we anticipate significant demand for our CDMO business for the next several years across small, mid and large pharma and biotech as well as the U.S. government and NGOs.

75.     On September 14, 2020, the Company presented at the Morgan Stanley Annual Global Healthcare Conference.  Defendant Lindahl claimed that J&J and AstraZeneca chose Emergent due to the "history we have of high-quality manufacturing of delivering on complex problems of the fact that we had capacity available in the --- primarily in the Bayview facility that we have, which was designed expressly for the purpose in partnership with the government of dealing with an emergency just like COVID."  Defendant Lindahl added that Emergent's manufacturing sites can "handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now."

76.     On November 5, 2020, Emergent announced its financial results for the third quarter and nine-month period ending September 30, 2020.  That same day, it conducted an investor conference call.   During the call, defendant Husain discussed the Company's collaborations with COVID-19 vaccine developers.  In particular, defendant Husain stated:

I'm incredibly pleased to be here today to provide a deep dive into the CDMO business. As Bob noted earlier, we have demonstrated significant revenue and portfolio growth by deploying our expertise across development services, drug substance manufacturing and drug product manufacturing with both industry and government customers. While much of the recent growth has been driven by collaborations on COVID-19 programs, I want to emphasize the durability and sustainability of our CDMO business. Our ongoing investment in both capacity and new capabilities will increase our ability to meet the expected long-term demand, leading to significant long-term growth.

- 29 -

\*   \*   \*

Our confidence is based on several factors. First, we have an extremely successful track record of development and manufacturing abilities. Bob alluded to the history of Emergent in his comments, and that legacy continues to benefit us to this day. We also have an enterprise team of more than 1,400 technical and quality compliance professionals, a vital key to our success. Another advantage is the location of our facilities and capabilities that are in close proximity to pharma and biotech hubs. Finally, we possess a unique biologics platform of technologies with customizable offerings across the entire drug development life cycle.

In the next couple of slides, I'll give a brief overview of the CDMO business. For those interested in more detail, the slides and transcript from our 2019 Analyst and Investor Day are available on our IR website. This slide shows the broad and varied offerings we provide to our customers, allowing for end-to-end integrated services. With 3 molecules to market service offerings, 5 technology platforms and 9 development and manufacturing sites, we have the foundation to meet the individual needs of our customers now and into the future. Given time constraints, I'm not going into detail on our service offerings, but do want to note 3 main buckets: development services; drug substance manufacturing; and drug product manufacturing and packaging. Again, offering 1, 2 and or all 3 services allows us to rapidly partner and collaborate with customers from concept to commercialization, which we describe as molecule-to-market.

The next slide shows a high-level overview of our facilities, which are spread across 9 locations in the United States, Canada and Switzerland. While this slide reinforces the substantial expertise and infrastructure already in place, importantly, it also shows the significant opportunity for expected further investments as evident with our active investments at 3 of our facilities: viral vector and gene therapy drug substance manufacturing at our Canton, Massachusetts facility; nonviral drug product manufacturing at our Baltimore, Maryland Camden facility; and viral drug product manufacturing at our Rockville, Maryland facility. This will allow us to increase our capacity to deliver on future business opportunities in the coming years. As a reminder, presently, we are only in -- only 1 year into the relaunching of this business to realize the full potential of our broad network of sites as well as growing capabilities and capacities.

77.     During the call, Jessica Macomber Fye, an analyst at JPMorgan Chase & Co, asked

"How flexible are the suites you're building out for the COVID vaccines?"  In response, defendant

Husain stated:

[A]ll of our development and manufacturing facilities are predicated on being multipurpose. So they are designed to handle multiple products. They have foundational technology platforms that then allow them to be customized for the specific product and process that we're working on. And specifically, when we talk

- 30 -

about the drug substance facility in Baltimore, which is known as our Bayview facility, so right now, that is predicated on multiple products being in there.

78.     Jacob William Hughes, an analyst at Wells Fargo Securities, LLC, asked, "And then on the CDMO business, maybe you could provide some additional detail on the cost that you're currently incurring related to your COVID-19 contracts? And then longer-term if a vaccine is successful, how should we think about the economics on a per dose basis for those contracts?"

79.     Defendant Kramer responded:

First of all, as Syed has articulated, we have a fairly broad and diverse network of 9 different CDMO development and manufacturing sites. And as you know, just from following us for quite some time, all of those manufacturing sites are a bit different. If you talk about capacity for COVID-19 vaccine development manufacturing in Bayview, which is where the majority of that work is being done, I think we've said out loud that we're pretty much capacity maxed out right now with the work that we're doing with J&J, with AZ, with Novavax and as well as with Vaxart.

80.     During the JPMorgan Healthcare Conference held on January 11, 2021, defendant Kramer stated:

I think in terms of the relationships with our collaborators, just -- they continue to be exceptionally strong. As you know, we're working with firms like J&J as well as AstraZeneca. We've done work for Novavax, for Vaxart and some other firms. It continues to evolve. It continues to get stronger. Our focus clearly during 2020 was to initially ensure that we're standing up the manufacturing muscle, if you will, to be able to support the large-scale vaccine manufacturing capability for a number of candidates. I think the relationship also with BARDA and OWS and HHS continues to be very strong.

81.     On February 18, 2021, the Company reported financial results for the fourth quarter and year ended December 31, 2020. That same day, Emergent held a conference call with investors. During the call, defendant Kramer stated that Emergent was "playing a critical role in the fight against COVID-19 with the development and manufacturing of clinical and commercial materials across our 3 CDMO service pillars for a variety of customers, most notably Johnson & Johnson, AstraZeneca…." In response to analyst inquiry, defendant Kramer stated, "Specific to

- 31 -

J&J, you know what they said in terms of their short-term goal is to provide as many as 100 million doses to the U.S. government in the first half of 2021.  And we're right on schedule to support that."

82.    Emergent filed its Annual Report filed on Form 10-K with the SEC on February 19, 2021.  Defendants Kramer, Lindahl, El-Hibri, Harsanyi, Zoon, Richard, Sullivan, Bailey, Joulwan, Hauer, and White signed the Form 10-K.  The Form10-K contained the following risk disclosures that had already arisen:

> Problems may arise during the production of our marketed products and product candidates, as well as those we produce for our CDMO customers, due to the complexity of the processes involved in their manufacturing and shipment. Significant delays in product manufacturing or development and our ability to ramp up production to meet the needs of our customers could cause delays in recognizing revenues, which would harm our business, financial condition, operating results and cash flows.

> \*        \*        \*

> Disruption at, damage to or destruction of our manufacturing facilities could impede our ability to manufacture anthrax vaccines, ACAM2000 or our other products, as well as deliver our CDMO services, which would harm our business, financial condition, operating results and cash flows.

> An interruption in our manufacturing operations could result in our inability to produce our products and product candidates for delivery to satisfy the demands of our customers in a timely manner, which would reduce our revenues and materially harm our business, financial condition, operating results and cash flows.

> \*        \*        \*

> In addition, we may not be able to ramp up our manufacturing processes to meet the rapidly changing demand or specifications of our customers on the desired timeframe, if at all.  For example, we have not previously had to ramp our organization for a commercial launch of any product at the current pace required to address treatments related to COVID-19 and doing so in a pandemic environment with an urgent, critical global need creates unique manufacturing challenges, challenges related to distribution channels, and the need to establish teams of people with the relevant skills. Our inability to ramp up manufacturing to meet the demand or specifications of our customers could also harm our business, financial condition, operating results and cash flows.

#5179809v.1

83.     On March 1, 2021, Emergent participated in the J.P. Morgan Global Leveraged Finance and High Yield Conference.   Defendant Lindahl presented at the conference.   The presentation contained a slide that claimed Emergent had a "Proven 22-year track record in preparedness and response[,]" was a "[t]rusted partner to governments" and had a "[s]calable and sustainable business model[.]"  In particular, it stated:

## Company snapshot 

A life sciences company with a diversified portfolio of **products + pipeline** plus **CDMO services** focused on addressing **public health threats.**

- Proven **22-year track record in preparedness and response**
- **Leadership positions** in key public health threat markets
- **Trusted partner** to governments, NGOs and pharma/biotech innovators
- Organized as **four distinct business units** with shared services
- **Scalable and sustainable** business model

4    WHO WE ARE                                    JPMorgan Leveraged Finance/High Yield Conference 2021

### THE TRUTH EMERGES

84.     On March 31, 2021, the *New York Times* published the article referenced above concerning the contamination of J&J and AstraZeneca's vaccines at the Bayview Facility.  The article revealed that employees at the Bayview Facility mixed up the ingredients in the two different vaccines.  The "mix-up" went uncovered for days until J&J's quality controls, not Emergent's, discovered the problem.  Emergent's mix-up ruined 15 million doses of J&J's badly needed vaccine.

85.     On April 1, 2021, the *Associated Press* reported on Emergent's "history of violations," noting that the FDA has repeatedly cited Emergent for problems such as poorly trained employees, cracked vials and problems managing mold and other contamination in its facilities.

86.     On this news, Emergent's market capitalization plunged more than 13%, or $12.45 per share, on April 1, 2021, to close at $80.46 per share compared to the previous trading day's closing of $92.91 per share, erasing $667 million in market capitalization in a single day.

87.     Then, on April 3, 2021, the *New York Times* reported that the Biden administration took the extraordinary action of putting J&J in charge of Emergent's Baltimore plant and prohibiting the Bayview Facility from producing the AstraZeneca vaccine. The article called the "ingredient mix-up" and stripping of Emergent's control over its own plant "a significant setback and public relations debacle."

88.     As the Emergent's deficient controls history continues to leak out, the Company's stock price has continued to fall, closing at $56.61 on May 25, 2021, representing just 42% of the Emergent's stock high on August 13, 2021 of almost $135 per share.  In total, Emergent's market capitalization fell $4.1 billion.

## INSIDER SALES BY DEFENDANTS KRAMER, SULLIVAN, RICHARD, BAILEY, HARSANYI, JOULWAN, AND ZOON

89.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Emergent's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Emergent, defendants Kramer, Sullivan, Richard, Bailey, Harsanyi, Joulwan, and Zoon were privy to material, nonpublic information about the Company's true business health.

90.     While in possession of this knowledge, defendant Kramer sold 88,555 shares of his personally held Emergent stock for proceeds of $10.1 million.  Defendant Kramer sales were timed

to maximize profit from Emergent's then artificially inflated stock price.  While the sales were completed pursuant to a 10b5-1 trading plan, defendant Kramer entered into the plan on November 13, 2020.  This was shortly after AstraZeneca was forced to discard millions of doses of its vaccine in October 2020 due to Emergent's failures and around the same time J&J had to discard millions of its doses because Emergent killed the virus by incorrectly hooking up a gas line.  Defendant Kramer's sales were drastically out of line with his past sales practices.  Between May 2, 2019, and April 23, 2020 (the time period immediately before the false statements, the "Pre-Sale Period"), defendant Kramer did not sell any of his personally held Emergent stock.

91.     While in possession of this knowledge, defendant Sullivan sold 28,418 shares of his personally held Emergent stock for proceeds of $3.1 million.  Defendant Sullivan's sales were drastically out of line with his past sales practices.  During the Pre-Sale Period, defendant Sullivan sold only $930,000 worth of his personally held Emergent stock, less than one-third the amount he sold during the relevant period.

92.     While in possession of this knowledge, defendant Richard sold 29,119 shares of his personally held Emergent stock for proceeds of $2.7 million.  Defendant Richard's sales were drastically out of line with his past sales practices.  During the Pre-Sale Period, defendant Richard sold only $644,000 worth of his personally held Emergent stock, less than one-fourth the amount he sold during the relevant period.  Further, defendant Richard's sales represent nearly 78% of his holdings.

93.     While in possession of this knowledge, defendant Bailey sold 18,155 shares of her personally held Emergent stock for proceeds of $1.8 million.  Defendant Bailey's sales were drastically out of line with her past sales practices.  During the Pre-Sale Period, defendant Bailey

sold only $822,000 worth of her personally held Emergent stock, less than half the amount she sold during the relevant period.

94.    While in possession of this knowledge, defendant Harsanyi sold 11,549 shares of his personally held Emergent stock for proceeds of $1.3 million.  Defendant Harsanyi's sales were drastically out of line with his past sales practices.  During the Pre-Sale Period, defendant Harsanyi sold only $604,000 worth of his personally held Emergent stock, less than half the amount he sold during the relevant period.

95.    While in possession of this knowledge, defendant Joulwan sold 8,000 shares of his personally held Emergent stock for proceeds of $915,000.  Defendant Joulwan's sales were drastically out of line with his past sales practices.  During the Pre-Sale Period, defendant Joulwan did not sell any of his personally held Emergent stock.

96.    While in possession of this knowledge, defendant Zoon sold 6,753 shares of her personally held Emergent stock for proceeds of $620,000.

97.    In sum, defendants Kramer, Sullivan, Richard, Bailey, Harsanyi, Joulwan, and Zoon sold over $20.6 million worth of stock at artificially inflated prices as detailed by the table below:

| Defendant Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| KRAMER | 1/15/2021 | 19,026 | $106.01 | $2,016,900.60 |
| | 1/20/2021 | 2,232 | $110.00 | $245,520.00 |
| | 1/21/2021 | 21,900 | $110.03 | $2,409,657.00 |
| | 2/8/2021 | 32,397 | $120.03 | $3,888,611.91 |
| | 2/8/2021 | 13,000 | $120.03 | $1,560,390.00 |
| | Total (Sales) | 88,555 | Total Proceeds | $10,121,079.51 |
| | | | | |
| SULLIVAN | 9/2/2020 | 20,525 | $111.22 | $2,282,702.24 |
| | 9/2/2020 | 7,893 | $111.23 | $877,903.66 |
| | Total (Sales) | 28,418 | Total Proceeds | $3,160,605.90 |
| | | | | |
| RICHARD | 4/27/2020 | 7,893 | $78.00 | $615,654.00 |
| | 5/5/2020 | 8,357 | $80.19 | $670,185.44 |

#5179809v.1

| | | | | |
|---|---|---|---|---|
| | 6/3/2020 | 6,572 | $87.51 | $575,142.01 |
| | 8/7/2020 | 6,297 | $131.00 | $824,907.00 |
| | **Total (Sales)** | **29,119** | **Total Proceeds** | **$2,685,888.44** |
| | | | | |
| **BAILEY** | 6/3/2020 | 5,322 | $87.50 | $465,690.97 |
| | 8/18/2020 | 4,665 | $128.31 | $598,563.82 |
| | 3/4/2021 | 8,168 | $92.37 | $754,478.16 |
| | **Total (Sales)** | **18,155** | **Total Proceeds** | **$1,818,732.94** |
| | | | | |
| **HARSANYI** | 5/11/2020 | 4,940 | $81.99 | $405,024.67 |
| | 8/17/2020 | 6,609 | $133.71 | $883,664.28 |
| | **Total (Sales)** | **11,549** | **Total Proceeds** | **$1,288,688.95** |
| | | | | |
| **JOULWAN** | 5/11/2020 | 2,000 | $85.19 | $170,371.20 |
| | 8/11/2020 | 6,000 | $124.11 | $744,635.40 |
| | **Total (Sales)** | **8,000** | **Total Proceeds** | **$915,006.60** |
| | | | | |
| **ZOON** | 5/12/2020 | 1,660 | $85.21 | $141,454.24 |
| | 5/26/2020 | 4,093 | $85.10 | $348,322.08 |
| | 8/10/2020 | 1,000 | $130.27 | $130,270.00 |
| | **Total (Sales)** | **6,753** | **Total Proceeds** | **$620,046.32** |
| | | | | |
| | | | | |
| | **Total Sales** | **190,549** | **Total Proceeds** | **$20,610,048.67** |

## **DAMAGES TO EMERGENT**

98.     As a result of the Individual Defendants' improprieties, Emergent disseminated improper, public statements.  These improper statements have devastated Emergent's credibility as reflected by the Company's $4.1 billion, or 57.5% market capitalization loss.

99.     Emergent's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Emergent's current and potential customers consider a company's ability to provide safe, clean, and compliant facilities.  Businesses are less likely to award contracts to companies that are do not provide such necessary environments in such a highly regulated industry.  Emergent's ability to raise equity capital or debt on favorable terms in the future is now also impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated

#5179809v.1

by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

100.    Further, as a direct and proximate result of the Individual Defendants' actions, Emergent has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs incurred from reimbursements, penalties, or similar payments to J&J and AstraZeneca for the destroyed or contaminated vaccines or supplies; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Emergent.

101.    In addition, the Insider Selling Defendants took advantage of the Company's material nonpublic information to benefit themselves.   The Company is entitled to recoup the illegal profits these defendants earned through their sales.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

102.    Plaintiff brings this action derivatively in the right and for the benefit of Emergent to redress injuries suffered, and to be suffered, by Emergent as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Emergent is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

103.    Plaintiff will adequately and fairly represent the interests of Emergent in enforcing and prosecuting its rights.

104.     Plaintiff was a stockholder of Emergent at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Emergent stockholder.

105.     The current Board of Emergent consists of the following nine individuals El-Hibri, Kramer, Joulwan, Harsanyi, Hauer, Richard, Sullivan, Zoon, and White.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Kramer, Joulwan, Harsanyi, Hauer, Richard, Sullivan, Zoon, and White Face a Substantial Likelihood of Liability for Their Misconduct**

106.     As alleged above, defendants Kramer, Joulwan, Harsanyi, Hauer, Richard, Sullivan, Zoon and White breached their fiduciary duties of loyalty by making or approving the improper statements.

107.     Defendants Kramer, Harsanyi, Richard, Joulwan, and Zoon sold Emergent stock on the basis of nonpublic information.  As directors and officers, defendants Kramer, Harsanyi, Richard, Joulwan, and Zoon possessed material, nonpublic Company information and used that information to benefit themselves.  Accordingly, defendants Kramer, Harsanyi, Richard, Joulwan, and Zoon face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon defendants Kramer, Harsanyi, Richard, Joulwan, and Zoon is futile.

108.     Defendants Harsanyi, Joulwan, Richard, and Sullivan, as members of the Audit Committee, reviewed and approved the improper statements and the deficient controls at the Bayview Facility.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, disclosure, and regulatory requirements.   Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

- 39 -

109.    Defendants Harsanyi, Hauer, White, and Zoon, as members of the Scientific Review Committee, reviewed and approved the deficient controls at the Bayview Facility.  The Scientific Review Committee's Charter provides that it is responsible for providing guidance related to existing products and technology platforms and also providing guidance to the Board regarding collaborations.  In this role, the Scientific Review Committee would know and discuss the Bayview Facility's deficient controls and what those meant for collaborations with J&J and AstraZeneca regarding their vaccine candidates.  Accordingly, the Scientific Review Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Scientific Review Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

110.    Defendants El-Hibri, Harsanyi, Hauer, Kramer, Richard, White, and Zoon, as members of the Strategic Operations Committee, reviewed and approved the deficient controls at the Bayview Facility.  The Strategic Operations Committee's Charter provides that it is responsible for reviewing material litigation, the Company's financial plans and programs, Emergent's activities on corporate reputation, while also making recommendations to the Board with respect to the Company's mission, core strategy, strategic plan objectives and the strategic process.  In this role, the Strategic Operations Committee would know and discuss the Bayview Facility's deficient controls and what those meant for collaborations with J&J and AstraZeneca regarding their vaccine candidates.  The Strategic Operations Committee would also know about the Company's customer's claims against Emergent's controls in the arbitration proceedings.  Accordingly, the Strategic Operations Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Scientific Operations Committee

Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

111.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.     The Individual Defendants owed and owe Emergent fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Emergent the highest obligation of care and loyalty.

113.     The Individual Defendants and each of them, violated and breached their fiduciary duties.

114.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Emergent has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

115.     Plaintiff, on behalf of Emergent, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

116.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Emergent.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Emergent.

- 41 -

118.    The Insider Selling Defendants sold Emergent stock while in possession of material, nonpublic information that artificially inflated the price of Emergent stock.  As a result, these defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

119.    Plaintiff, as a stockholder and representative of Emergent, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

120.    Plaintiff, on behalf of Emergent, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Emergent, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Emergent to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Emergent and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over its facilities compliance with FDA rules and regulations;

2.    a proposal to strengthen the company's controls over financial reporting;

- 42 -

       3.      a provision to control insider selling;

       4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

       5.      a provision to permit the stockholders of Emergent to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Emergent has an effective remedy;

D.      Awarding to Emergent restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

#5179809v.1

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 29, 2021

Respectfully submitted,

**TYDINGS & ROSENBERG LLP**

*/s/ John B. Isbister*

John B. Isbister (#00639)
jisbister@tydings.com
Daniel S. Katz (#01148)
dkatz@tydings.com
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460

*Local Counsel for Plaintiff*

**ROBBINS LLP**
Brian J. Robbins (Pro Hac to be applied)
Craig W. Smith (Pro Hac to be applied)
Shane P. Sanders (Pro Hac to be applied)
Emily R. Bishop (Pro Hac to be applied)
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com
ebishop@robbinsllp.com

*Counsel for Plaintiff*

1522693

- 44 -

#5179809v.1